UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-20574-CR-LENARD(s)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| AEY, INC, | ) |
| EFRAIM DIVEROLI, *et al.*, | ) |
| | ) |
| *Defendants.* | ) |
| _____ | ) |

---

**DEFENDANTS AEY, INC. AND EFRAIM DIVEROLI'S
JOINT MOTION TO DISMISS THE FIRST SUPERSEDING
INDICTMENT FOR FAILURE TO STATE OFFENSES**

---

HOWARD M. SREBNICK
[Fla. Bar No. 919063]
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 South Biscayne Boulevard
Suite 1300
Miami, FL 33131
Telephone: (305) 371-6421
Facsimile:  (305) 358-2006
E-mail:  hsrebnick@royblack.com
[*Counsel for Efraim Diveroli*]

G. RICHARD STRAFER
[Fla. Bar No. 389935]
G. RICHARD STRAFER, P.A.
201 South Biscayne Boulevard, Suite 1380
Miami, Florida 33131
Telephone:  (305) 374-9091
Facsimile: (305) 377-9937
E-mail:  straferpa@aol.com
[*Of Counsel*]

HY SHAPIRO
[Fla. Bar No. 271871]
HY SHAPIRO, P.A.
2400 S. Dixie Highway
Second Floor
Miami, FL 33133
Telephone: (305) 854-8989
Facsimile: (305) 854-8782
E-mail: hyshapiropa@aol.com
[*Counsel for AEY, Inc.*]

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

MEMORANDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.  BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.  Contract No. W52P1J-07-D004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.  The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.  THE ARMY WAS NOT "DEFRAUDED" BECAUSE NEITHER THE EMBARGO NOR THE DFAR WERE VIOLATED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.  The Korean War and Tianamen Square Embargos Act . . . . . . . . . . . . . . . . . . . . 5

    C.  The DFAR Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.  The Phrase "Directly or Indirectly" Does Not Mean "Country of Origin" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  THE *EX POST FACTO* VIOLATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  THE BREACH OF CONTRACT THEORIES OF FRAUD FAIL TO STATE OFFENSES . . . . . . . . . 16

    A.  "Breach of Contract" Cannot Be Prosecuted as "Fraud" . . . . . . . . . . . . . . . . . . . 16

    B.  The Government Was Not Defrauded of Any Property Right Cognizable Under the Wire and Major Fraud Statutes  . . . . . . . . . . . . . . . . . . . 16

V.  THE FALSE STATEMENT CHARGES FRAUD FAIL TO STATE OFFENSES . . . . . . . . . . . . . . . 19

    A.  The Alleged False Statements in the Certificate of Conformance . . . . . . . . . . . . 19

    B.  The Applicable FARs, DFARs and Published Forms . . . . . . . . . . . . . . . . . . . . . 19

    C.  The Actual Language of the Certificate of Conformance Form  . . . . . . . . . . . . . 23

    D.  The COC Forms Did Not Contain Any False Statements . . . . . . . . . . . . . . . . . . 26

    E.  The Ad Hoc COC Form Used in this Case Violated the APA  . . . . . . . . . . . . . . 29

    F.  The Identity of the Manufacturer Was Immaterial For the Purpose of the COC Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*ACLU v. Mineta,*
    319 F. Supp. 2d 69, 76-77 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*American Bus Association v. United States,*
    627 F.2d 525, 528 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*American Federation of Government Employees v. Block,*
    655 F.2d 1153 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*American Iron and Steele Institute v. EPA,*
    568 F.2d 284, 299 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Annulli v. Panikkar,*
    200 F.3d 189, 192 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Appalachian Power Co. v. Train,*
    566 F.2d 451, 455 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*B-West Imports, Inc. v. United States,*
    19 C.I.T. 303 880 F. Supp. 853 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Belcrest Linens v. United States,*
    741 F.2d 1368 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Blount Financial Services, Inc. v. Heller & Co.,*
    819 F.2d 151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brown Express, Inc. v. United States,*
    607 F.2d 685 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Camiolo v. State Farm Fire & Casualty Co.,
    334 F.3d 345, 364-65 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Chamber of Commerce of the United States v. O.S.H.A.,*
    636 F.2d 464 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cleveland v. United States,*
    531 U.S. 12, 24 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crandon v. United States,*
    494 U.S. 152, 178 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Eaves v. Board of Clark County Commissioners,*
    96 Nev. 921, 620 P.2d 1248 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ferrostaal Metals Corp. v. United States,*
    11 C.I.T. 470, 664 F. Supp. 535 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iv

*Florsheim Shoe Co. v. United States*,
　　19 C.I.T. 295, 880 F. Supp. 848 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Heaton* and *Teague v. Regional Comm. of Customs, Region II*,
　　404 F.2d 441 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Heaton v. United States*,
　　353 F.2d 288 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Johnson v. Lee*,
　　281 F. Supp. 650, 655  (D. Conn. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*,
　　162 F.3d 1290, 1318-19 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,
　　904 F.2d 786 (1st Cir.), *cert. denied*, 498 U.S. 992 (1990)  . . . . . . . . . . . . . . . . . . . . . . . 16

*McNally v. United States*,
　　483 U.S. 350, 359-60 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16, 18

*National Juice Products Assoc. v. United States*,
　　10 C.I.T. 48, 628 F. Supp. 978 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Pac Fung Feather Co., LTD*,
　　19 C.I.T. 1451, 911 F. Supp. 529 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Tanner v. United States*,
　　483 U.S. 107 (1987)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Union of Concerned Scientists v. Nuclear Regulatory Comm.*,
　　711 F.2d 370, 382 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Ahangaran*,
　　998 F.2d 521 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Bradley*,
　　428 F. Supp. 2d 1365 (S.D. Ga. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Brown*,
　　79 F.3d 1550, 1557 (11th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bruchhausen*,
　　977 F.2d 464, 467 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Calhoon*,
　　97 F.3d 518, 526 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

　*United States v. Chandler*,
　　388 F.3d 796, 803 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

v

*United States v. Cochran*,
109 F.3d 660, 667 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*United States v. D'Amato*,
39 F.3d 1249, 1261 & n. 8 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*United States v. DeCastro*,
104 F. 2d 1289, 1292 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*United States v. De La Mata*,
266 F.3d 1275 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Denemark*,
779 F.2d 1559 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*United States v. Devegter*,
198 F.3d 1324, 1328-30 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Gaudin*,
515 U.S. 506, 509 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*United States v. Gimbel*,
830 F.2d 621 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*United States v. Goodrich*,
871 F.2d 1011, 1015 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Handakas*,
286 F.3d 92, 107 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

 *United States v. Hassanzadeh*,
271 F.3d 574 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*United States v. Harris*,
942 F.2d 1125, 1132 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Howell*,
No. CRF07-2013-MWB (N.D. Iowa (Feb. 1, 2008) . . . . . . . . . . . . . . . . . . . . . . . . .  6, 13

*United States v. Johnson*,
937 F.2d 392, 399 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Larson*,
794 F.2d 244 (8th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*United States v. Levy*,
553 F.2d 969 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Lopez-Lukis*,
102 F.3d 1164, 1169 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Manapat*,
928 F.2d 1097 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Mersky,*
   361 U.S. 431 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*United States v. Migliaccio,*
   34 F.3d 1517, 1525 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. Mittelstaedt,*
   31 F.3d 1208, 1216-18 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Paradies,*
   98 F.3d 1226, 1283, n. 30 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Reinis,*
   794 F.2d 506, 508 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*United States v. Richter,*
   610 F. Supp. 480, 489 (N.D. Ill. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*United States v. Ryan,*
   828 F.2d 1010, 1015-16 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*United States v. Rybicki,*
   354 F.3d 124, 144 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Santos,*
   128 S.Ct. 2020 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29

*United States v. Stewart,*
   311 U.S. 60, 64 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*United States v. $200,000 In United States Currency,*
   590 F. Supp. 866, 874 (S.D. Fla. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13

*United States v. Vollmer & Company, Inc.,*
   1 F.3d 1511, 1521 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*United States v. Walters,*
   997 F.2d 1219, 1226, n. 3 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*United States v. Whiteside,*
   285 F.3d 1345, 1351-52 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

*United States v. You-Tsai Hsu,*
   364 F.3d 192 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

**Statutes**

DFAR §252.225-7007(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 5, 9

FAR, 48 C.F.R. § 46.315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

(b)(2), 12(b)(3)(B) and 17.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

5 U.S.C. § 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

5 U.S.C. § 553(a)(1), or (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

18 U.S.C. §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 29

18 U.S.C. §1956(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

19 U.S.C. § 1304(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 U.S.C. § 3592(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 C.F.R. § 134.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19 C.F.R. § 2092. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

26 U.S.C. § 7602 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

31 C.F.R. §500.204 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8

31 C.F.R. § 500.201(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

48 C.F.R. §252.225-7007(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 20, 22

50 C.F.R. § 10.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Miscellaneous**:

Department of State Dispatch, Vol. 05, No. 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Natural Resources*, 316 F.3d at 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Independent Guard Assoc. of Nev.*, 57 F.3d 766, 769 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . 14, 15

71 FR 53045 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Department of Defense Forms Management Program,
    http://www.dtic.mil/whs/directives/infogt/forms/formsprogram.htm
    http://www.dtic.mil/whs/directives/infogt/forms/forminfo/forminfopage2126.htm1. . . . . . . . 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 08-20574-Cr-Lenard(s) |
| | ) | |
| AEY, INC, | ) | |
| EFRAIM DIVEROLI, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| _____ | ) | |

### DEFENDANTS AEY, INC. AND EFRAIM DIVEROLI'S JOINT MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT FOR FAILURE TO STATE OFFENSES

The Defendants, AEY, INC. and EFRAIM DIVEROLI, through undersigned counsel, respectfully move this Court, pursuant to Rules 12(b)(2), 12(b)(3)(B) and 17.1 of the Federal Rules of Criminal Procedure, Article I, Section 9, Clause 3 of the United States Constitution, commonly known as the *Ex Post Facto* Clause, the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, for an order dismissing the First Superseding Indictment (the "Indictment"). In support of this motion, the Defendants submit the following Memorandum, broken down into five parts.

Part I demonstrates that all of the charges in the Indictment are based, in whole or in part, on the theory that the Defendants breached a clause in one of AEY's 170-plus government contracts, Contract No. W52P1J-07-D004 (hereinafter "the Contract"). According to the government's theory, the Defendants violated a Chinese arms embargo and parallel Defense Federal Acquisition Regulation ("DFAR"), 48 C.F.R. §252.225-7007(b), that were incorporated into the Contract. Based principally on the claim that the Defendants violated the Contract, the government claims that they also "defrauded" the Army when they satisfied the Contract by obtaining the munitions from Albania which, in turn, had acquired them from China sometime during the Cold War. Despite the fact that the embargo was not imposed until 1989 (in response to the massacre of Chinese dissidents at Tiananmen Square), the charges are based on the theory that even trading in *pre*-embargo munitions violates the embargo and DFAR regulation. Part I thus demonstrates that the government's breach-of-contract-as-fraud theory of prosecution rests on the

government's claim that the embargo and DFAR apply to all munitions made in China, even in situations where China had sold them to other countries *decades* before the embargo was imposed.

Part II demonstrates that the government's construction of the embargo and parallel DFAR is mistaken, as a matter of law. The Defendants' use of Albanian-owned munitions that had originally been manufactured in China, but unconditionally sold or given to Albania decades before the embargo was imposed, did not violate either the embargo or the DFAR and, hence, did not breach the Contract. The government's construction of the embargo and DFAR is based on a single phrase in the DFAR which bans trading in munitions obtained "directly *or indirectly*" from China. (Emphasis added.) The government contends that the word "indirectly" means that the DFAR prohibits trading in munitions whose "country of origin" was China, no matter how long ago those munitions were sold by China to other countries. Part II demonstrates that the government's construction is contradicted by the phraseology and construction of other, similar embargo statutes and regulations. When Congress and administrative agencies wish to ban transactions involving products that "originated" in a foreign country, no matter how long ago, they know how to do so – they ban transactions in the designated product whose "*country of origin*" is the embargoed country. That key phrase was not used in the current Chinese embargo or in the DFAR. Hence, it was not unlawful for the Defendants to use the pre-embargo munitions to satisfy the Contract and the Army was not "defrauded." For the same reason, any representations about the country that originally manufactured the munitions were not "material" as a matter of law.

Part III demonstrates that charges based upon DFAR §252.225-7007(b) violate the *ex post facto* clause of the Constitution because the effective date of the DFAR was *March 27, 2007*, while the contract at issue herein was awarded on *January 26, 2007*. An "interim rule" that was announced in September 2006 was promulgated in violation of the Administrative Procedure Act ("APA") and, therefore, cannot be used to salvage the government's DFAR theory.

Part IV demonstrates that Counts 1, 37-85, charging "wire fraud" and "major fraud," fail to state offenses. Part IV(A) demonstrates the "fraud" allegations are simply dressed up breach of contract claims. However, courts have unanimously held that a breach of contract cannot be prosecuted as wire "fraud."

Part IV(B) demonstrates that both the wire and major fraud charges are also defective because the alleged breach of contract did not deprive the Army of any cognizable form of "property." The government's "fraud" claims are based upon the theory that the Army would not have awarded the contract to AEY had it known that the munitions were of Chinese origin. However, the "right to control" a sale is not a "property" right under *McNally v. United States*, 483 U.S. 350 (1987), and it progeny.

Part V demonstrates that the "false statement" theory of prosecution contained in all counts of the Indictment likewise fails to state an offense. These charges are based upon the Defendants' answer to a question on the Certificates of Conformance ("COCs") that were filed with the Army after the munitions shipments left Albania and arrived safely and undamaged in Afghanistan. The question required the defendants to state: "Manufacturer (point of origin)." The Defendants answered this question by providing the name and address of the company in Albania from where *the shipment* "originated." The government contends that this question really required the Defendants to provide the name and address of the company in China that "manufactured" the ammunition sometime between 1965-1974. Part V demonstrates that these charges are barred, as a matter of law, by the doctrine of "fundamental ambiguity" that precludes false statement prosecutions where there is *any* reasonable interpretation of the question that would make a defendant's answer correct. Alternatively, Part V demonstrates that the identity of the manufacturer was immaterial because the applicable statutes and regulations only require contractors to identify the *shipping address* as the "point of origin." No statute or rule requires them to identify the original manufacturing company. Finally, Part V demonstrates that the prosecution is barred because the non-standard Certificate of Conformance form used in this case deviated from the requirements of the applicable regulations and, therefore, violated the APA.

**MEMORANDUM**

I.   **BACKGROUND**

A.   **Contract No. W52P1J-07-D004**

AEY is a Miami Beach company that was founded in 1999 and in 2004 began contracting with various government agencies, primarily the Department of Defense and Department of State, to supply them with munitions.  Between 2004-2006, AEY was awarded 149 contracts valued at close to $10.5 million.  In fiscal year 2007, AEY was awarded 29 contracts.  The Contract, *see* **EXHIBIT 1**, was designed to provide non-standard ammunition to the Army, which intended to give it to the Islamic Republic of Afghanistan.  *See* Indictment, at p. 2.

Afghanistan was occupied by the Soviet Union between 1979 and early 1989.  *See* http://en.wikipedia.org/wiki/Democratic_Republic_of_Afghanistan.  When the Soviets withdrew, they left behind weapons that the Afghan government used for its own army.  The Contract was designed to provide ammunition for this Soviet-era weaponry.  Accordingly, the Army was well aware that the successful bidder on the Contract would have to obtain the munitions from former "Eastern Block" countries, most of which retained storehouses of such munitions after the fall of the Soviet Union.  The Contract itself makes this perfectly clear.  The Army incorporated directly into the Contract a series of "amendments" drafted in the form of questions and answers.  In its answers, the Army indicated that:  (1) there was no "age limitation" on the items covered by the contract, as long as they were "serviceable and issuable";  (2) "surplus" items were similarly acceptable, as long as they were "serviceable and issuable";  (3) the Army had no objection to shipments "directly from the *eastern bloc*"; and (4) the items could include munitions that met "NATO Spec, *Warsaw Pact* and/or commercial equivalent."  *See* **EXHIBIT 1**, pp. 4, 6, 8 (emphasis added).  Finally, during the bidding process, in answer to the question "Is ammunition from China acceptable for this contract - assuming that it meets the technical specifications?," the Army did not say "No!"  Instead, the Army stated that "[t]he solicitation itself does not expressly prohibit any source of supply," that the Contract merely "require[d] the ammunition be compatible with the identified weapon systems in

-4-

good working order" and that it was the responsibility of the contractor to "identify and resolve" and issues pertaining to "any other statutory or regulatory restrictions...." *Id.* at p. 8. Later in the contract, the Army expressly incorporated DFAR §252.225-7007(b) but did not amend or amplify its prior answer about "ammunition from China." *Id.* at pp. 10-11.

### B. The Indictment

All of the charges in this case are based on the theory that the Defendants defrauded the Army by selling it munitions that they obtained from Albania but which were originally manufactured by China and unconditionally sold or given to Albania during the Cold War. According to the Indictment, using Chinese-manufactured munitions to comply with the Contract violated the DFAR clause of the contract. *See* Indictment, p. 2, ¶10 (emphasis added). Paragraph 10 has been expressly incorporated into every count of the Indictment. *See id.*, pp. 2, 5, 10, 17.

## II. THE DEFENDANTS DID NOT VIOLATE THE EMBARGO OR THE DFAR

### A. Introduction

Prior to the return of the Indictment, the Defendants gave the prosecutors a draft "Motion to Dismiss For Failure To State An Offense" that exposed many of the flaws raised herein. The Defendants attached a copy of the draft motion to their motion to vacate the restraining order. *See* DE 129, pp. 26-84. The draft motion assumed that the government intended on charging the Defendants with direct violations of the embargo and related regulations, including DFAR 252.225-7007. Recognizing, the (at best) tenuous nature of its claim that pre-embargo munitions were banned, the government has scrupulously avoided charging the Defendants *directly* with violating the embargo and the DFAR. In a futile attempt to disguise this core defect, the government has predicated the charges on the Contract itself through a "breach-of-contract-as fraud" theory. The use of such a theory, however, has only compounded the original defects.

### B. The Korean War and Tiananmen Square Embargos

After China intervened in the Korean war, in December 1950, President Truman initiated the first embargo of Chinese goods. *See also* DE129, p. 34. The embargo was implemented through a

-5-

Treasury Department regulation, 31 C.F.R. §500.204, which prohibited the importation without a license of "*any merchandise...*situated outside the United States ... the *country of origin of which* is China (except Formosa)." (Emphasis added.)

Restrictions on trade between the United States and China remained until 1980, when China was given Most Favored Nation ("MFN") status. *See also* DE129, p. 35. Following the massacre at Tiananmen Square in 1989, President Bush imposed a series of limited sanctions against China, all of which were designed to punish *only* the Chinese military. *See* DE129, pp. 35-36.[1] In 1993, President Clinton, while continuing to maintain China's MFN status, extended the embargo to include "imports" of munitions in reaction to reports of continuing human rights abuses. *See* Department of State Dispatch, Vol. 05, No. 22; *see also* DE 129, p. 38. The ban continued in various forms, all limited to munitions, from 1994-2005. *See B-West Imports, Inc. v. United States*, 19 C.I.T. 303, 304-05; 880 F. Supp. 853, 857-58 (1995), *affirmed,* 75 F.3d 633 (Fed. Cir. 1996); *see also* DE 129, pp. 38-40.

C.      **The DFAR Regulations**

On January 6, 2006, Congress amended 10 U.S.C. §2302 to prohibit the Secretary of Defense from "procur[ing] goods or services ... through a contract ... or any subcontract ...*from any Chinese Communist military company*." *See* **EXHIBIT 2** (emphasis added). However, the word "from" was not defined. On September 8, 2006, the Department of Defense ("DoD") published "interim rules" to implement the amendment. Although the rules had not yet undergone *any* "notice and comment" period as required by the APA, the DoD proclaimed that this was unnecessary: "A determination has been made under the authority of the Secretary of Defense that urgent and compelling reasons exist to publish an interim rule prior to affording the public an opportunity to comment." 71 FR 53045 (September 8, 2006). The interim regulation provided, in pertinent part, that "[a]ny supplies or services covered by the United States Munitions List that are delivered under this contract may not

---

[1] President Bush subsequently vetoed three attempts by Congress to remove China from MFN status. *See also* DE 129, pp. 36-37.

-6-

be acquired *directly or indirectly*, from a Communist Chinese military company."  71 FR 53045 (September 6, 2006)(proposed rule, 48 C.F.R. §252.225-7007(b)).  *See* **EXHIBIT 3**.

The Contract in this case was signed in *January, 26 2007*, while only the interim rule was in effect.  The interim rule did not become final until *March 27, 2007*.  72 FR 14239 (March 27, 2007) (final rule, 48 C.F.R. §252.225-7007(b)).  *See* **EXHIBIT 4**.

### D.    "Directly or Indirectly" Does Not Mean "Country of Origin"

As set forth above, both the embargo and DFAR §252.225-7007(b) prohibit government contractors from acquiring munitions "*directly or indirectly* from a Communist Chinese military company."  The government claims that the word "indirectly" means that the ban includes munitions that were manufactured in China *at any time in history* and sold to other countries  – even when the sales occurred, as here, decades before the Tiananmen Square embargo commenced.  The government's construction is not compelled by the plain meaning of the word "indirect."  Nor is it consistent with the clear purpose of the current Chinese embargo.  In sharp contrast to unlimited Korean War embargo, the current embargo was only meant to punish the Chinese military in a limited fashion for human rights violations committed post-1989.  That purpose would not be furthered by prohibiting transactions with countries *other than* China when these countries already owned the Chinese-manufactured munitions and the Chinese military no longer had any economic interest in the transactions.  The only countries harmed by such a construction of the embargo would be other countries, not China.

In addition to making no sense given the limited purpose for the embargo, the government's proposed construction flies in the face of the language used in numerous other embargoes.  If the President and agencies charged with implementing the goals of the embargo wished to prevent all traffic in Chinese-manufactured munitions, no matter who purchased them or when, they only had to look to the first time such a broad embargo was implemented against China in 1950.  That embargo, as previously discussed, implemented this purpose by the tried and true method of barring transactions involving property "the country of origin of which" is China.  *See* pp. 5-6 *supra*.

-7-

The Korean War embargo was challenged in *Heaton v. United States*, 353 F.2d 288 (9th Cir. 1965), *cert. denied*, 384 U.S. 990 (1966).  Heaton was charged with violating 31 C.F.R. §500.204 by importing art objects that originated in China without a license to do so.   The defendant argued that the prohibition did not apply, or was unconstitutional as "retroactive in operation," because the property had left China *before* the effective date of the embargo.  The court rejected the defendant's argument, finding, first, that under the plain meaning of the regulation ("country of origin of which"), the regulation did apply to pre-embargo goods.  However, the court found that any constitutional problem in this construction was ameliorated by the fact that the ban only required the defendant to obtain a license.  The court emphasized that a licensing policy had been issued simultaneously with the regulation that would permit the importation of Chinese made goods that was "locat[ed] outside China" upon the "submission of documentary evidence" that (1) the goods had been outside of China "at all times" since the effective date of the embargo and (2) the Chinese government had no remaining "interest" in the goods after they were sold.  *Heaton*, 353 F.2d at 290, citing 31 C.F.R. § 500.204, Appendix, Licensing Policies, para. 112.  The court expressly did not decide whether the absence of such a savings provision would have rendered the retroactive ban unconstitutional.  *Id.* at 292, n. 4.

The regulatory scheme governing the current embargo against Iran is similar to the 1950 embargo against China.  The Iranian embargo covers all goods and services "of Iranian *origin*" or which are "owned or controlled by the Government of Iran."  *See* 31 C.F.R. §§ 560.201, 560.206(a)(1) (emphasis added).  Until 1995, § 560.504 exempted "non-fungible" goods, such as carpets and artwork, that were "located outside of Iran prior to the effective date" of the embargo.  The only cases under the Iranian embargo that involved imports through intermediary countries pertained to *post*-embargo exports from Iran.  *See United States v. Hassanzadeh*, 271 F.3d 574 (4th Cir. 2001);  *United States v. Ahangaran*, 998 F.2d 521 (7th Cir. 1993).

Numerous other statutes and regulations also employ the phrase "country of origin" when their intent is to reach back to *pre*-embargo transactions. *See, e.g.,* 19 U.S.C. § 1304(a)[2]; 19 U.S.C. § 3592(b); 19 C.F.R. § 134.1(b); 19 C.F.R. § 2092. These regulations have been applied to determine what constitutes "Chinese origin fabric." *Pac Fung Feather Co., LTD*, 19 C.I.T. 1451, 911 F. Supp. 529 (1995). *See also Belcrest Linens v. United States*, 741 F.2d 1368 (Fed. Cir. 1984). The Fish and Wildlife Service has also promulgated regulations defining the "country of origin" for products imported from Taiwan. *See* 50 C.F.R. § 10.12. This regulation has been construed to ban the importation of "wildlife" products from Taiwan. *See Florsheim Shoe Co. v. United States*, 19 C.I.T. 295, 880 F. Supp. 848 (1995) (banning the importation from Taiwan of shoes made of elk skin from Finland).

Conversely, the phrase "directly or indirectly" has been used by agencies in regulations to mean something *other than* "country of origin." For example, the Office of Foreign Assets Control ("OFAC") promulgated 31 C.F.R. § 500.201(a) to define what transactions are prohibited when those transactions involve designated foreign countries and their nationals:

> (a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury .... if either such transactions are by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof, has *at any time on or since the effective date of this section* had any interest of any nature whatsoever, *direct or indirect*.....[list of prohibited transactions omitted].

(Emphasis added.) On its face, §500.201(a) applies only to *current* interests of the foreign country ("on or since the effective date of this section"). The phrase "direct or indirect" was used, not to reach back in time, but to expand the "manner" in which the financial transactions occurred. *See, e.g., ACLU v. Mineta*, 319 F. Supp. 2d 69, 76-77 (D.D.C. 2004) (construing the phrase "directly or indirectly" in a statute to mean "in any manner"); *Johnson v. Lee*, 281 F. Supp. 650, 655 (D. Conn. 1968) ("[t]he use of the word 'indirectly' is ... proper when read, as it must be, as synonymous with

---

[2]  Tariff regulations promulgated under § 304 have used the term "country of origin" in the same manner for decades. *See, e.g., United States v. Mersky*, 361 U.S. 431 (1960); *National Juice Products Assoc. v. United States*, 10 C.I.T. 48, 628 F. Supp. 978 (1986); *Ferrostaal Metals Corp. v. United States*, 11 C.I.T. 470, 664 F. Supp. 535 (1987).

'in any manner'").  At least one court has found the use of the phrase "directly or indirectly" in a criminal statute to be unconstitutionally vague.  *See Eaves v. Board of Clark County Commissioners*, 96 Nev. 921, 620 P.2d 1248 (1980).  Although ITAR regulations have withstood vagueness challenges in the past, *see, e.g., United States v. You-Tsai Hsu*, 364 F.3d 192 (4th Cir. 2004), none of these challenges involved the meaning of the word "indirectly."

The language used in the regulations governing the Cuban embargo is similar to the OFAC regulation.  The regulation prohibits certain "transactions" if those transactions–

> are by, or on behalf of, or pursuant to the direction of a foreign country designated under this chapter, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has *at any time on or since the effective date of this section* had any interest of any nature whatsoever, <u>*direct or indirect*</u>.....[list of prohibited transactions omitted].

31 C.F.R. §515.201 (emphasis added.)  The effective date of the Cuban embargo was July 8, 1963 (*see* §515.201(d)).  However, a separate regulation governing the embargo on "imports" uses the phrase "Cuban origin" to reach back in time. 31 C.F.R. § 515.204(a).  Therefore, under the regulations governing the Cuban embargo, the term "directly or indirectly"  means "in any manner," not "country of origin."  By the term "indirectly," OFAC only prohibited the acquisition of products that were made in Cuba *after* the date of the embargo surreptitiously through other countries.  It did not intend to ban trading in pre-embargo products already sold when the embargo began.  Conversely, when OFAC wanted to ban products of Cuban "origin," it said so by using that word.

The government's theory that pre-embargo products are barred when the embargo or applicable regulation uses the term "directly or indirectly" is also contrary to charging decisions of the Department of Justice.  Counsel are unaware of any indictments in this or any other District involving the trade in *pre*-embargo products, despite the fact that dozens of web sites can be found on the internet that openly advertise the sale of "Pre-Castro" and "Pre-Embargo" *See* EXHIBIT **5**.  Pre-embargo Chinese munitions are also readily available on the Internet.  *See* EXHIBIT **6.**

*Heaton* and the comparisons to other embargo and tariff regulations are pertinent to the issues presented by the instant case for several reasons.  First, neither the embargo nor the DFAR at issue

-10-

in this case employed the phrase "country of origin" to clearly refer to Chinese munitions that had been sold by China *prior* to the effective date of the embargo.  When Congress or federal agencies wish to ban transactions involving goods sold prior to the embargos, they uniformly use the phrase "country of origin" to evince this intent.  Indeed, the version of §500.204 that has been in place since at least 1981,[3] in addition to omitting China entirely from the ban, contains a detailed provision concerning when the banned countries (North Korea, Viet-Nam and Cambodia) would be considered the "country of origin" for a laundry list of products that might be "combined" in third-party countries.  *See* §500.204(a)(1).  As previously discussed, the language employed in the Korean war version of §500.204, accomplished the broader embargo by specifically including China in the list of countries.  *See* pp. 5-6 *supra*.

Second, *Heaton* and the Iranian embargo regulations also suggest that even when a regulation employs the term "country of origin," other regulations have typically exempted from the ban merchandise that had been sold to other countries *prior* to the effective dates of the embargos.  And, if they did do so expressly, as with the Cuba regulations, it is obvious that no enforcement actions have been taken against importers of "Pre-Castro" or "Pre-Embargo" cigars.

Third, *Heaton* confirms that the language used to impose an embargo is to be construed in accordance with the purpose behind the embargo.  *See Heaton*, 353 F.2d at 291 ("[t]he purpose of the statute and implementing regulations [was] to deny communist China an outlet for its goods in the United States market").  Since the purpose of the Korean war-time embargo against China was to broadly punish China's entire economy, the court further stated in dicta that such a broad purpose could potentially justify even a retroactive ban on Chinese products sold to other countries prior to the embargo's effective date.  *Id.* at 291-292 & n. 3 (citation omitted).  The current embargo, as previously noted, has a much narrower purpose.

---

[3] The oldest regulations counsel could pull from Lexis/Nexis were from 1981.  Counsel found the versions from the 1960's in *Heaton* and *Teague v. Regional Comm. of Customs, Region II*, 404 F.2d 441 (2d Cir. 1968), *cert denied*, 394 U.S. 977 (1969).

-11-

In conclusion, the government's breach-of-contract-as fraud theory flounders from its inception. There was no "breach" of the Contract because neither the embargo nor the DFAR apply to the munitions the Defendants obtained from Albania. Moreover, any ambiguity in the term "indirectly" means that the Court must, under the rule of lenity, adopt the Defendants' construction. "[T]o give persuasive effect to the Government's expansive [regulations under a criminal statute] ... would turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Crandon v. United States*, 494 U.S. 152, 178 (1990) (Scalia, J., concurring). *See also Tanner v. United States*, 483 U.S. 107 (1987) (applying the rule of lenity to determine that an alleged conspiracy to defraud a private company supervised by the federal government did necessarily not constitute a conspiracy "to defraud the United States").

## III.   THE EX POST FACTO VIOLATION

Application of DFAR §252.225-7007(b) to the Defendants would also violate the *Ex Post Facto* Clause of the Constitution. The Contract was awarded on January 26, 2007, but §252.225-7007 did not become final until March 27, 2007. In the instant case, the only regulation in place at the time the contract was signed was the *interim* version of the regulation that was unilaterally issued by the DoD on September 8, 2006. However, since the interim rule was issued without the notice and comment period required by the APA, it is a nullity. *See, e.g.*, *Brown Express, Inc. v. United States*, 607 F.2d 685 (5ᵗʰ Cir. 1979); *Chamber of Commerce of the United States v. O.S.H.A.*, 636 F.2d 464 (D.C. Cir. 1980); *Appalachian Power Co. v. Train*, 566 F.2d 451, 455 (4ᵗʰ Cir. 1977); *United States v. $200,000 In United States Currency*, 590 F. Supp. 866, 874 (S.D. Fla. 1984).

Similarly, it is also well established that criminal charges cannot be based on a rule (or "form" masquerading as a rule) unless that rule/form has been properly promulgated under the APA. For example, in *United States v. Levy*, 553 F.2d 969 (5ᵗʰ Cir. 1976), a defendant was prosecuted for filing a false statement with the IRS in violation of 26 U.S.C. § 7602. IRS agents required Levy to fill out a Form 433-AB and list all his assets. Levy filled out the form but concealed some of his assets. The Fifth Circuit nonetheless reversed Levy's conviction, since there was no statute or

regulation authorizing the agents to require Levy to use the Form 433-AB. "Therefore, we do not believe the conviction of Levy for a felony in connection with Form 433-AB can stand." *Levy*, 553 F.2d at 975.

This issue also arose in the early 1990's before Congress passed a statute specifically prohibiting "structured" transactions, 31 U.S.C. § 5324. Prior to the enactment of § 5324 and amendments to Treasury Department regulations, the government attempted to prosecute criminal "structuring" based only on requirements found in a Customs form – requirements that had never been promulgated under the APA. Until a specific regulation *was* promulgated, courts barred prosecutions, holding that the requirements of the form constituted a regulation that violated the APA. *See, e.g.*, *United States v. Reinis*, 794 F.2d 506, 508 (9th Cir. 1986) (reversing conspiracy and false statement convictions based on Form 4789 where the form "was never promulgated pursuant to the rule making requirements" of the APA). *Accord United States v. Denemark*, 779 F.2d 1559 (11th Cir. 1986); *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987); *United States v. Larson*, 794 F.2d 244 (8th Cir. 1986); *United States v. Richter*, 610 F. Supp. 480, 489 (N.D. Ill. 1985).[4] *Cf. $200,000*, 590 F. Supp. at 873 (barring the government from proceeding on a civil forfeiture case predicated upon the improperly promulgated Customs Form 4790, holding that the claimant's "substantive rights should not be affected by a rule so flawed in its promulgation").

Accordingly, the fraud charges in this case violate the *Ex Post Facto* clause unless one of the exceptions to the APA's notice and comment requirement applies. The APA applies (1) "except to the extent that there is involved ... a military or foreign affairs function of the United States," 5 U.S.C. § 553(a)(1), or (2) except "when the agency for good cause finds ... that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. §

---

[4] The district courts are currently split nationwide about the constitutionality under the *Ex Post Facto* clause of criminal charges against sex offenders for failing to register, as required by 18 U.S.C. § 2250(a), that were based on conduct occurring *before* the Attorney General issued a properly promulgated a rule defining when registration had to occur. *See generally United States v. Howell*, No. CRF07-2013-MWB (N.D. Iowa (Feb. 1, 2008), *2008 U.S. Dist. LEXIS 7810*, at ** 31-36 (finding *ex post facto* violation and listing decisions on both sides of the split).

553(b).   Courts have repeatedly emphasized, however, that these and other (inapplicable) exceptions to the notice and comment requirements are to be narrowly construed.  *See, e.g., Independent Guard Assoc. of Nev.*, 57 F.3d 766, 769 (9th Cir. 1995) (citation omitted), *as amended by* 69 F.3cd 1038 (9th Cir. 1995); *American Bus Association v. United States*, 627 F.2d 525, 528 (D.C. Cir. 1980).

Both the courts and the legislative history of the exemption for "military or foreign affairs function" make clear that an agency's *title* is not determinative, since many agencies, including the Army, "perform both 'civilian and 'military' functions." *Independent Guard Assoc. of Nev.*, 57 F.3d at 769.  For example, in *Independent Guard Assoc. of Nev.*, the court held that the exemption for a "military affairs function" did not apply to a dispute involving the Department of Energy's ("DOE") nuclear weapons program because the dispute involved *a contract* between the DOE and *a civilian* company, Wackenhut, despite the fact that the purpose of the contract was to hire guards for the DOE's nuclear facilities.  The court rejected the argument that "all functions of the War and Navy Department as well as the Army and Navy should be exempted" and, instead, stated that "since the bill relates to functions, rather than to agencies, it would seem better to define "functions."  *Id.* at 769.  The court expressly rejected the argument that "the contractor support function" of the contract satisfied the exemption, in part, because "no court" had "ever considered whether the military function exemption applies to civilian contractors" and that the "dearth of authority ... suggests [the military exemption] has not been widely invoked."  *Id.* at 770.

In light of the narrow construction given the exemptions by the courts, agencies can and have promulgated regulations that expressly confer exempt status on their rule-making.  *See, e.g.,* 22 C.F.R. §128.1;  31 C.F.R. § 501.804(a).  The DFAR regulations contain no such pronouncement. This is not surprising, since "international trade is an area in which notice-and-comment is especially important because of the threat of international retaliation against U.S. actions perceived as

-14-

protectionist."  William D. Araiza, *Note: Notice-and-Comment Rights for Administrative Decisions Affecting International Trace: Heightened Need, No Response*, 99 YALE L. J. 669, 683 (Dec. 1989).[5]

The "good cause" exemption has been construed even more narrowly.  Of the three possible bases for this exemption ("impracticable, unnecessary, or contrary to the public interest"), only the "impracticable" clause could apply in this situation.  However, the term "'[i]mpracticable' means a situation in which the due and required execution of the agency's functions would be unavoidably prevented by its undertaking public rule-making proceedings."  *Independent Guard Assoc. of Nev.*, 57 F.3d at 769 (citation omitted).  *See also Natural Resources*, 316 F.3d at 911;  *American Iron and Steele Institute v. EPA*, 568 F.2d 284, 299 (3d Cir. 1977).

In this instance, in unilaterally issuing the interim rule, the Secretary of Defense *asserted* that "urgent and compelling reasons" justified not following the APA.  However, these alleged "reasons" were never identified – either then or when the final rule was finally published.  *See* 72 FR 14239 (March 27, 2007).  The Secretary's failure to articulate a *reviewable* justification for abandoning the APA itself constitutes grounds for rejecting the claim.  *See American Federation of Government Employees v. Block*, 655 F.2d 1153 (D.C. Cir. 1981).  Moreover, "an inability to promulgate a final rule on time and [an agency's] reluctance to place licensees in jeopardy of enforcement action pending issuance of a final rule ... are insufficient."  *Union of Concerned Scientists v. Nuclear Regulatory Comm.*, 711 F.2d 370, 382 (D.C. Cir. 1983).  Courts have repeated rejected "impending deadline[s]" as "good cause."  *Union of Concerned Scientists*, 711 F.2d at 382 (holding interim rule invalid) (citations omitted).  Enforcement of the interim rule in this case is thus barred by both the APA and the *Ex Post Facto* Clause of the Constitution.

---

[5] As an example, the author cited the controversy concerning "country of origin" rules concerning certain Chinese agricultural products, including fears by "U.S. agricultural interests, who feared a repeat of the 1983 Chinese boycott of American wheat in response to previous protectionist textile rules promulgated by the U.S."  Araiza, 99 YALE L. J. at 683 (footnotes omitted).

-15-

**IV.   THE BREACH OF CONTRACT THEORIES OF FRAUD FAIL TO STATE OFFENSES**

**A.      "Breach of Contract" Cannot Be Prosecuted as "Fraud"**

As previously discussed, the government has attempted to avoid dismissal by framing the "fraud" only in terms of the AEY's alleged breach of the Contract.  However, a breach of contract is not a crime under the mail and fraud statutes and, therefore, cannot be used as the basis for "fraud" charges.  *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1318-19 (11th Cir. 1998) (dismissing mail fraud claims from civil RICO case where the claim was "nothing more than breach of contract" and, therefore, "would not constitute a 'scheme to defraud'" proscribed by the mail and wire fraud statutes).  *See also United States v. Chandler*, 388 F.3d 796, 803 (11th Cir. 2004).  Indeed, every circuit that has squarely addressed the issue has agreed that mail and wire "fraud" does *not* encompass conduct that amounts to breach of contract.[6]  The "fraud" charges, therefore, fail to state offenses and should be dismissed.

**B.      The Government Was Not Defrauded of Any "Property" Right**

**1. *Section 1343 Only Protects Traditional Forms of "Property"***

In *McNally v. United States*, 483 U.S. 350, 359-60 (1987), the Supreme Court held that §1341 was "limited in scope to the protection of property rights" and that without "clear and definite language" from Congress, the Supreme Court will not select a "harsher" reading of a criminal statute that expands federal criminal law.  *Id.*  In *Cleveland v. United States*, 531 U.S. 12, 24 (2000), the Supreme Court extended *McNally* by holding that a governmental entity's right to issue licenses was not a "property" right, rejecting "the Government's theories of property rights [which] stray from traditional concepts of property."  Applying these principles, the Supreme Court held that an *unissued* license by a governmental entity did not constitute "property."

---

[6] *See Camiolo v. State Farm Fire & Casualty Co.*, 334 F.3d 345, 364-65 (3rd Cir. 2003);  *United States v. Handakas*, 286 F.3d 92, 107 (2nd Cir. 2002);  *Annulli v. Panikkar*, 200 F.3d 189, 192 (3rd Cir. 1999); *United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997); *United States v. D'Amato*, 39 F.3d 1249, 1261 & n. 8 (2nd Cir. 1994);  *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.), *cert. denied*, 498 U.S. 992 (1990);  *Blount Financial Services, Inc. v. Heller & Co.*, 819 F.2d 151, 152-53 (6th Cir. 1987).

According to the Supreme Court's clear direction, before allowing a prosecution under the mail and wire fraud statutes (and, by extension, the major fraud statute modeled after them), courts must assure themselves that (1) the alleged scheme seeks to take away a traditional and clearly defined category of "property" and (2) that Congress gave clear indication of its intent to criminalize the conduct. Any ambiguity in either requirement must be resolved in favor of lenity. The asserted property right in this case – the Army's right to control the issuance of contracts– fails the Supreme Court's definition of "traditional theories of property."

## 2. The "Right to Control" a Sale is Not Itself a "Property" Right

In the instant case, the indictment does not allege that the Army was defrauded because it received defective ammunition. Rather, the Indictment is based entirely upon the theory that the Army was defrauded because, had it known that the munitions were manufactured in China, it would not have awarded AEY the Contract. In effect, the government is contending that the Army was deprived of its *"right of control"* over the *source* of the munitions. However, the "right of control" is not *itself* a "property" right, independent of the economic terms of the transaction, such as "fair market value" and factors affecting pricing. Courts that have squarely addressed the issue have rejected the theory that the "right of control" is itself a property right. *Accord United States v. Handakas*, 286 F.3d 92, 101 (2nd Cir. 2002), *cert. denied*, 537 U.S. 894 (2002);[7] *United States v. Mittelstaedt*, 31 F.3d 1208, 1216-18 (2nd Cir. 1994); *United States v. Vollmer & Company, Inc.*, 1 F.3d 1511, 1521 (7th Cir. 1993), *cert. denied*, 510 U.S. 1043 (1994); *United States v. Bruchhausen*, 977 F.2d 464, 467 (9th Cir. 1992). The Eleventh Circuit has also rejected the argument, in a public sector setting, that the "right to control" is a property right that can be the basis of a fraud prosecution. *See United States v. Goodrich*, 871 F.2d 1011, 1015 (11th Cir. 1989). Although the

---

[7] The *en banc* Second Circuit in *United States v. Rybicki*, 354 F.3d 124, 144 (2nd Cir. 2003) (en banc), *cert. denied*, 543 U.S. 809 (2004), overruled the part of *Handakas* holding §1346 unconstitutional but a majority (6 of the 11 judges) endorsed the ultimate conclusion in *Handakas* that "because of the nature of the services to be rendered in *Handakas*, an intangible right to honest services did not arise out of the contract at issue in that case." *Rybicki*, 354 F.3d at 144.

Eleventh Circuit has not squarely addressed the issue in a private sector case, it has broadly held that mail fraud in the private sector requires at least a risk of *economic* harm to the alleged victim.  *See United States v. Devegter*, 198 F.3d 1324, 1328-29 (11th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000) (citations omitted).  If, as in *Devegter*,  private sector "intangible rights" mail fraud cases require proof of a threat of "economic harm," surely such a threat must be proven in private sector "property rights" cases involving no breach of any fiduciary duty.

The facts alleged in the Indictment also would not support an "intangible" right theory of fraud under §1346.  As construed by the Eleventh Circuit both before *McNally* and after the enactment of §1346, the "intangible rights" doctrine requires the existence of either a private or public "fiduciary" duty between the defendant and the "victim" of the fraud – *i.e.,* either between the citizen/employee and his employer or between the public official and the public.  *See, e.g., United States v. De La Mata*, 266 F.3d 1275 (11th Cir. 2001);  *United States v. Devegter*, 198 F.3d 1324, 1328-30 (11th Cir. 1999), *cert. denied*, 530 U.S. 1264 (2000);  *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997);  *United States v. Paradies*, 98 F.3d 1226, 1283, n. 30 (11th Cir. 1996).  When no fiduciary duty exists between the defendant and the "victim" of the fraud, there is no "scheme to defraud" within the scope of the mail and wire fraud statutes. *See United States v. Brown*, 79 F.3d 1550, 1557 (11th Cir. 1996) (reversing conviction where there was no "special fiduciary relationship" between the defendants and their customers which would require accurate and complete disclosures by the defendants during their sales pitches);  *United States v. Walters*, 997 F.2d 1219, 1226, n. 3 (7th Cir. 1993) (since sports agent did not owe a fiduciary duty to universities, the agent did not defraud the universities of their intangible right to control which student athletes received scholarships by bestowing gifts on athletes);  *United States v. Bradley*, 428 F. Supp. 2d 1365 (S.D. Ga. 2006) (dismissing Section 1346 charges where there was only aa contract between a buyer and seller).

There is no allegation in the Indictment that AEY owed any fiduciary duty to the Army, and the "right of control" is not a "property" right.  Therefore, the charges based on this theory of "property" must be dismissed.

-18-

**V.**   **THE FALSE STATEMENT CHARGES FRAUD FAIL TO STATE OFFENSES**

**A.**   **The Alleged False Statements in the Certificate of Conformance**

The Indictment is also based upon a "false statement" theory of prosecution.  According to government, the Defendants made false statements or misrepresentations to the Army in a "Certificate of Conformance" form by allegedly misrepresenting on the form that "the *manufacturer and point of origin* of the ammunition being delivered was the Military Export and Import Company ... in Tirana, Albania" rather than China.  *See* Indictment, at p. 5, ¶4(d) (emphasis added).  This theory of prosecution is not only pursued in the conspiracy charge in Count 1 but also in the 35 "false statement" counts levied under 18 U.S.C. §1001 in Counts 2-36.  Thus, according to these counts, the defendants falsely "represented in Certificates of Conformance ... that the ammunition being furnished under [the Contract] was *manufactured and originated in Albania*, when, in truth and in fact, ... the ammunition was not manufactured and did not originate in Albania."  Indictment, pp. 8-9 (emphasis added).  Finally, Counts 37-71 charge the Defendants with committing a major fraud under 18 U.S.C. §1031, in part, by "misrepresenting" where the ammunition was "*manufactured and originated*."  *Id.* at p. 11 (emphasis added).

**B.**   **The Applicable FARs, DFARs and Published Forms**

The government's construction of the COC is conclusively refuted by an examination of federal regulations governing procurement contracts, Title 48 of the Code of Federal Regulations, Chapter 1 (Federal Acquisition Regulations or "FAR") and Chapter 2 (Defense Acquisition Regulations System or "DFAR"), as well as an examination of the forms that both agencies, as well as the Army, have formally promulgated in connection with these rules.  Both FAR and DFAR contain detailed requirements for government contracts and both agencies have promulgated forms to be used in the compliance process.[8]  No FAR or DFAR regulation and no form published by either agency requires the contractor to identify the "manufacturing" country.  And, although FAR contains

---

[8] For example, FAR's requirements for the use of specific forms can be found at 48 C.F.R. §§ 53.100, *et seq.*  DFAR contains similar regulations.  *See* 48 C.F.R. § 253.303.

-19-

a lengthy regulation defining dozens of terms used throughout the regulations, there are no definitions provided for the terms "manufacturer," "point of origin" or "origin." *See* 48 C.F.R. §2.101.

      As part of the checks and balances in the regulations, FAR and DFAR require government personnel to inspect goods tendered for delivery by the contractor and for two parallel forms to be filled out. As indicated on its website, the Department of Defense has adopted DD Form 250 (August 2000) for this purpose.[9] *See* EXHIBIT **7**. Each question is in a numbered block. The contractor completes the first part of the form (blocks 1-20) to identify the goods being delivered and the government inspector completes the inspection part – block 21 entitled "Contract Quality Assurance." The form itself calls for identification and address of the shipper and the recipient. Nowhere does the form require the identification of the *manufacturer*.

      FAR has also published a detailed Appendix for use in filling out the blocks. *See* EXHIBIT **8**. The Appendix indicates that the purpose of the form is to establish "quality assurance at *origin* or destination." *Id.* at F-103 (emphasis added). It is clear from the form itself that the term "origin" means the address from where the goods are being shipped. *See* Block 11 (entitled "Shipped From"). The form also requires the contractor (in block 8) to list the "acceptance point" – which the Appendix indicates means that the agency can accept the shipment either at the shipping point, the "origin," or at the "destination." Similarly, in Block 21, the part of the form that the government inspector must complete, the inspector must also check a box for "origin," which the Appendix continues to define as the shipping point. *See* EXHIBIT **8**, Block 21(iv).

      When a contract also requires both DD Form 250 and the completion of a COC, the Appendix directs the inspector as follows:

> *When contract terms provide for use of Certificate of Conformance and shipment is made under these terms, the contractor shall enter in capital letters "CERTIFICATE*

---

[9]  *See* Department of Defense Forms Management Program, http://www.dtic.mil/whs/directives/infogt/forms/formsprogram.htm and http://www.dtic.mil/whs/directives/infogt/forms/forminfo/forminfopage2126.html.

*OF CONFORMANCE"* in Block 21a on the next line following the CQA and acceptance statements.  Attach or include the appropriate contractor signed certificate on the top copy of the DD Form 250 copies distributed to the payment office or attach or include the appropriate certificate on the contract administration office copy....

*See* **Exhibit 8**, Block 21(iii) (emphasis added).  The use of a COC in place of the "source inspection" is permitted by 48 C.F.R. §46.504.[10]

The Army Field Support Command and Joint Munitions Command has also recently promulgated a method for the electronic submission of payment requests.  *See* **Exhibit 9**.  The directions provide that when a contractor is ready to ship the munitions, DD Form 250 may be used and submitted.  In some circumstances, the directions indicate that a separate "receipt and accountability document" is required and must contain "shipped to, marked for, shipped from, mode of shipment, contract quality assurance and acceptance data" that includes: (1) the unit price, (2) the unit of measure, (3) quantity shipped, (4) the extended dollar amount, (5) the contract number and shipping documents.  Again, there is no request for the identity of the *manufacturer*.

The government's construction of the COC in this case is inconsistent with the interrelationship between DD Form 250, pertinent regulations and the Appendix instructions which should be construed *in pari materia*.  *See generally United States v. Stewart*, 311 U.S. 60, 64 (1940) ("all [statutory and regulatory] acts *in pari materia* are to be taken together as if they were one law").  DD Form 250 uses the term "origin" only to mean the shipping location.  Under the Block 21 instructions, the COC may be used for contracts that would otherwise require inspection at the source or "origin" of the shipment.  Nothing requires an inspection of the factory where the products may have been manufactured decades earlier than the shipping date.  Such a requirement would have been particular absurd in this case where the Contract permitted the use of "surplus" munitions from the former Warsaw Pact and where the Defendants truthfully stated directly on the COC that the ammunition was manufactured between 1965-1974.  It would have made no sense for the COC to

---

[10] Section 46.504 provides: "A certificate of conformance (see 46.315) may be used is certain instances instead of source inspection (whether the contract calls for acceptance at source or destination) at the discretion of the contracting officer...."

suddenly add a requirement, the identity of the "manufacturer," that was not required by any statute or regulation, that was not sought on the companion DD Form 250 and that would have no bearing on the inspection process.

An analysis of the COC regulations confirms the defendants' analysis.  Under FAR, 48 C.F.R. § 46.315, the "contracting officer" must insert language from another regulation, 48 C.F.R. § 52.246-15, into its COCs.  Section 52.246-15 provides that the COC must be included for "any supplies for which the contract would otherwise require inspection *at the source*." (Emphasis added.) By "the source," the regulations means the shipping point where the "inspection" could otherwise have occurred.  The COC must also contain the following:

 "I certify that on insert date insert Contractor's name furnished the supplies or services called for by Contract No.  via [Carrier on [identify the bill of lading or shipping document in accordance with all applicable requirements. I further certify that the supplies or services are of the quality specified and conform in all respects with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements, and physical item identification (part number), and are in the quantity shown on this or on the attached acceptance document.

Under the regulation, the sole purpose of the COC is to be a substitute for an inspection at the shipping point and to ensure that the shipment is not "defective" so that the government can reject damaged goods.   For that reason, the phrase "conform to the contract" is limited to issues pertaining to quality control, not the enforcement of embargoes or to find out where the goods may have been manufactured decades earlier.

The Defendants' construction of the COC language is also confirmed by an examination of the only COC form that counsel has been able to find that has been authorized by a federal agency. For its procurement projects, the Department of Energy uses Form 540.04 (November 11, 2006). *See* **Exhibit 10**.  Form 540.04, like DD Form 250, contains numbered blocks for the contractor or "supplier" to fill out.  Block 8 requests "Source of origin," which the accompanying instructions then define: "Enter the *point of shipping origin* by city, state, and country if different than Block 7.  The *point of origin shall be the originating location from which final shipment/delivery to the INL is*

_made_...."  (Emphasis added.)  It is crystal clear from this definition that the terms "source or origin" and "point of origin" mean the shipping location, not the manufacturing location.

        C.      **The Actual Language of the Certificate of Conformance Form**

      As previously noted, the false statement charges are based on language in the particular COC form used in connection with the Contract.  A copy of one of these forms is attached hereto as **Exhibit 11**.  The government contends that the COC was false in two respects.

      First, the government claims that the "Quality Statement" on the first page of the form was false.  The "Quality Statement" states that the shipment being sent via Ukrainian Cargo Airlines was "of the quality specified and conform[s] in all respect with the contract requirements, including specifications, drawings, preservation, packaging, packing, marking requirements and physical item identification (part number) and are in the quantity shown on this or on the attached acceptance document."  _Id._  The Indictment does _not_ allege that this representation was false based on the "specifications, drawings, preservation, packaging, packing, marking requirements and physical item identification" or in the "the quantity" of the ammunition.  Rather, the Indictment claims that the certification was false because the shipment allegedly violated a "contract requirement" that was not even listed in the certification itself.  As previously discussed, the government claims that the contract barred the Defendants from satisfying the contract with ammunition that was manufactured in China during the Cold War and sold decades ago to Albania.

      Second, the government claims that the Defendants made a false statement when they answered the question "Manufacturer (point of origin)" by indicating the "Ministry of Defense of Albania, MEICO - Military Export and Import Company, Road 4, Shkurti No. 5, Tirana, Albania."  _Id._  Instead of accurately quoting this question, the Indictment repeatedly construes the COC phrase "Manufacturer (point of origin)" to mean "manufacturer _and_ point of origin."  However, there are at least five possible constructions of the Contract's actual phrase "Manufacturer (point of origin)."

-23-

**Construction No. 1: Always list the *shipping* point.**

Since there is no "and" or "or" between the word "Manufacturer" and the parenthetical phrase "(point of origin)," the parenthetical could be construed as the form's *definition* of the term "Manufacturer." Under this construction, the contractor would be required to state the address from where the Defendants acquired and shipped the ammunition to the U.S. Army. If the ammunition came directly from its manufacturer, then the "point of origin" would be the "manufacturer." But where, as here, the ammunition was being shipped from a country that had acquired the ammunition from China decades ago, the form asked for the address from where the ammunition was being shipped. Under this construction, the Defendants' answer to the question was accurate.

**Construction No. 2: List either the manufacturer *or* the shipping point.**

The phrase "Manufacturer (point of origin)" could also be construed as "Manufacturer *or* point of origin." That construction would be consistent with the first and the Defendants' answer would again be accurate.

**Construction No. 3: List *both* the manufacturer *and* the shipping point.**

The phrase "Manufacturer (point of origin)" could also be construed as "Manufacturer *and* point of origin." That construction would arguably require the contractor to potentially list *two* addresses in situations where the manufacturer and shipping point were different: (1) the address of the "manufacturer" and (2) the shipping address. Under this construction, the defendants' answer would not be false but merely incomplete (and therefore not a crime), since only the shipping point was listed.

**Construction No. 4: Always list *only* the manufacturer.**

Finally, the phrase "Manufacturer (point of origin)" could be construed, as the government would have it, that the contractor *always* must provide *only* the identify of the "manufacturer." Under this absurd construction, nowhere on the form would a contractor have to identify the shipping point – even where, as here, the merchandise had been sitting in another country for decades and was being shipped from that country and not the manufacturing country.

-24-

**Construction No. 5: Manufacturer Refers to the Company Address, Not the Country.**

Finally, the government's construction assumes that the question is asking for the *country* of origin, rather than a specific "manufacturer." The Defendants obviously construed the question as requesting a specific address, since they answered "Ministry of Defense of Albania, MEICO - Military Export and Import Company, Road 4, Shkurti No. 5, Tirana, Albania." It is absurd to suggest that the Army intended for the Defendants to learn and provide the name and address of the manufacturing company in China or the Soviet Union that manufactured the ammunition. In response to the form's question "Year of Manufacture," the Defendants accurately specified "1965-1974." *See* **EXHIBIT 11**. Learning the name and address of the munitions factory where the ammunition was manufactured in 1965 would not have provided the Army with any material information about the quality of the ammunition some *forty yeas later* in 2007.

Moreover, the Army knew that the type of ammunition called for by the Contract included surplus ammunition (not just newly manufactured) and was going to be obtained, by whoever won the contract, from one or more former Eastern Bloc countries. *See* p. 4 *supra*. The fact that the Army was not asking for the identity of the factory where the ammunition was manufactured is corroborated by the other COC's submitted by the Defendants in this case. Albania was not the only source country. Significant portions of the ammunition came from Bulgaria and Hungary. The COCs submitted by the Defendants in connection with these shipments consistently identified only the addresses of the shipping points in Bulgaria and Hungary, not the factory in these countries or, more likely, the Soviet Union where the munitions were manufactured. *See* **EXHIBIT 12**. The government has never complained that these COCs were false or fraudulent for concealing the identity of the factories that originally manufactured the ammunition forty years ago.

**D.      The COC Forms Did Not Contain Any False Statements**

Based on both the ambiguous language of the COC form used in this case and the relationship of the COC requirement to the DD Form 250, the Court should reject the government's construction of the COC form, as a matter of law. The Court cannot accept, or allow a jury to

-25-

consider, the government's interpretation because to do so would violate well established Due Process principles. Where the truth or falsity of a contract or submission to a government agency rests on the interpretation of a question or language in the contract or form, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under *any* "reasonable interpretation of the law." *United States v. Whiteside*, 285 F.3d 1345, 1351-52 (11th Cir. 2002), citing *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994); *United States v. Harris*, 942 F.2d 1125, 1132 (7th Cir. 1991); *United States v. Johnson*, 937 F.2d 392, 399 (8th Cir. 1981).

In *Whiteside*, the Eleventh Circuit reversed the defendant's conviction for making a false statement in Medicare cost reports and for conspiracy to defraud the government by making false statements "where no Medicare regulation, administrative ruling, or judicial decision exist[ed] that clearly require[d] interest expense[s] to be reported in accordance with the original use of the loan." 285 F.3d at 1352 (citation omitted). In the absence of such definitive requirements, the Eleventh Circuit concluded that reasonable people could differ about the meaning of the requirement. *Id.* ("'competing interpretations of the applicable law [are] far too reasonable to justify these convictions.'"). *See also United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) (noting that even though the Medicaid regulations were clear regarding the royalty fees paid to a related party, the government failed to establish as a matter of fact that the fees claimed were actually in excess of what was clearly allowed under the regulations and thus had "failed to sustain its burden of prove the claim false by virtue of the nonreimbursable nature of the interest"). Using this standard first articulated more than 40 years ago, courts have not hesitated to dismiss false statement and perjury charges where the allegedly false statements consisted of responses to vague questions, the meaning about which persons of ordinary intelligence could not agree.

For example, in *United States v. Manapat*, 928 F.2d 1097 (11th Cir. 1991), the Eleventh Circuit affirmed the *pretrial dismissal* of false statement charges against a defendant who filled out a Federal Aviation Administration medical certificate application form. The questions at issue in

-26-

*Manapat* were whether the applicant had a "Record of Traffic Convictions" and a "Record of Other Convictions."  *Manapat*, 928 F.2d at 1099.  Those two "yes" or "no" questions were "buried" as the twenty-second and twenty-third questions in a section of the form titled "Medical History," which was "purportedly concerned with medical conditions."  *Id*. at 1101.  The Eleventh Circuit concluded that a reasonable person may have understood that the form was only "asking for convictions somehow related to medical conditions."  *Id*.  The Court concluded that the form was "fundamentally ambiguous" and that the answers to the questions posed were insufficient as a matter of law to support a conviction for false statements: "[W]e cannot allow juries to criminally convict a defendant based on their guess as to what the defendant was thinking at the time the response was made.  *Id*. at 1101 (citation omitted).

In the instant case, it is the government's proposed construction of the COC that is "unreasonable."  The government's construction is not supported by *any* statute, regulation or formally promulgated form.  It is contrary to the requirements of DD Form 250 and the Army's own electronic filing requirements.  It is contrary to common sense, since the Army knew the munitions were going to come from Cold War surpluses.  And,  it is contrary to the Army's own practices in this very case with respect to shipments from Bulgaria and Hungary.  As in *Manapat*, this Court should dismiss the charges.  *See also United States v. Ryan*, 828 F.2d 1010, 1015-16 (3d Cir. 1987) (reversing a defendant's conviction based on the doctrine of fundamental ambiguity involving the requirement that the defendant state his "prior address,"explaining that the word "previous" was capable of different interpretations by persons of ordinary intelligence: i.e., it could have been referring to any prior address, or the address immediately preceding the present domicile).

The doctrine of fundamental ambiguity is analogous to the rule of lenity which requires ambiguous statutes and regulations to be construed in favor of defendants.  A recent opinion of the Supreme Court relied heavily on the rule of lenity in construing the money laundering statute.  In, *United States v. Santos*, 128 S.Ct. 2020 (2008), *2008 U.S. LEXIS 4699 (June 2, 2008),* the Supreme Court was called upon to decide whether the term "proceeds" in the money laundering statute, 18

U.S.C. §1956(a)(1), meant "profits" or "receipts."  Justice Scalia, in his plurality opinion, noted that both interpretations could make sense:  "From the face of the statute, there is no more reason to think that 'proceeds' means 'receipts' than there it to think that 'proceeds' means 'profits.'" *Santos*, *2008 U.S. LEXIS 4699 at * 14.*  Justice Scalia then recognized that where the terms of a federal criminal statute are ambiguous, the ruling of lenity required the Court to adopt a meaning that *limited* the statute's reach.  As Justice Scalia put it –

> – Under a long line of our decisions, the tie must go to the defendant.  The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. [String citations omitted.] This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Santos*, *2008 U.S. LEXIS 4699*, at *14.*  Justice Scalia rejected speculation as a basis of determining the scope of a criminal statute, noting that "we do not play mind reader" and that "'probability is not a guide which a court, in construing a penal statute, can safely take.'" *Id.* at *15 (citation omitted).

The government argued that the Court should construe "proceeds" as "receipts" because that construction would further the overall goals of the statute by making "it easier to prosecute."  *Id. at * 22.*  Justice Scalia, however, rejected the government's argument as "turn[ing] the rule of lenity upside-down.  We interpret ambiguous criminal statutes in favor of defendants, not prosecutors." *Id. at *23.*  Justice Scalia also observed that the rule of lenity served important interests:

> [I]t not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly proscribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keep courts from making criminal law in Congress's stead.

*Id. at *14.*

The *Santos* decision began the process of statutory construction by relying on the ordinary language of the criminal statute under consideration.  It then rejected attempts by the parties to superimpose on Congress's choice of words different narrowing or expanding constructions based on policy arguments or to facilitate prosecution.   This Court should take the same approach in

-28-

construing the COC.   Although there may be five possible constructions of the question "Manufacturer (point of origin)," there are far fewer reasons to think "point of origin" means "country of manufacture" rather than "point of shipping origin" (the definition given in DOE Form 540.04).   No regulation or properly promulgated form requires the identity of the manufacturer (as distinct from the point of shipping origin).   If "point of origin" really was meant to mean "country of origin," then why use the word "point" instead of "country"?   Moreover, the purpose of the COC requirement is to act as a substitute for inspection at the point of shipping origin, not the original country of manufacture.   Under these circumstances, both the doctrine of fundamental ambiguity and rule of lenity require the Court to accept the Defendants' more lenient (as well as more logical) construction.

### E.        The Ad Hoc COC Form Used in this Case Violated the APA

For the same reasons that the interim regulation is unenforceable due to the violation of the APA's notice and comment requirements, the ad hoc COC forms used with respect to the Contract are unenforceable.   No statute or properly promulgated regulation requires contractors to state the original manufacturer of the goods being shipped using either DD Form 250 or a COC.   Neither conspiracy nor false statement prosecutions can be based on an allegedly false answer to a question in a government form, where no statute or rule authorizes the question in the first place.   *See* Section III, *supra*.

### F.        The Identity of the Manufacturer Was Immaterial For the Purpose of the COC Requirement

In an effort to resolve a conflict in the circuit courts, in 1996 Congress amended 18 U.S.C. §1001 to extend the "materiality" requirement of §1001 to *all* of subsection (a).   The amendment was intended to ensure that defendants were not held liable for "trivial falsifications."  *See United States v. DeCastro*, 104 F. 2d 1289, 1292 (11th Cir. 1997) (explaining materiality test "excludes trivial falsifications form prosecution").   To be "material," a statement must have the capacity to influence a decision or function of the recipient.  *United States v. Gaudin*, 515 U.S. 506, 509 (1995).

In the instant case, the identification of the factory in China that manufactured the ammunition as long ago as 1965 was "trivial" under any definition of the term.  As discussed in Sections V(B) and V(C), *supra*, the purpose for DD Form 250 and the related COCs was to ensure that merchandise met quality standards at both the shipping and receiving points.  COCs were used only as a substitute for inspection of the goods prior to shipment at the shipping point.  Who manufactured the goods forty years earlier had no bearing whatsoever on the quality control standards, as evidenced by the absence of such a question in DD Form 250, the Army's own form for electronic submission and the DOE's COC.  Any representations made in the COCs used in this case, therefore, were "trivial" and cannot form the basis of a criminal prosecution, as a matter of law.

## CONCLUSION

For all of these reasons, the Indictment should be dismissed.

Respectfully submitted,

/s/ Hy Shapiro
HY SHAPIRO, ESQ.
[Fla. Bar No. 271871]
Hy Shapiro, P.A.
2400 S. Dixie Highway
Second Floor
Miami, FL 33133
Telephone: (305) 854-8989
[*Attorney for AEY, Inc.*]

/s/ Howard M. Srebnick
HOWARD M. SREBNICK
[Fla. Bar No. 919063]
BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.
201 South Biscayne Boulevard, Suite 1300
Miami, FL  33131
Telephone: (305) 371-6421 Fax: (305) 358-2006
[*Attorney for Efraim Diveroli*]

G. RICHARD STRAFER
[Fla. Bar No. 389935]
G. RICHARD STRAFER, P.A.
201 South Biscayne Boulevard, Suite 1380
Miami, Florida 33131
Telephone:  (305) 374-9091
[*Of Counsel*]

-30-

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing has been furnished via CM/ECF filing

to Eloisa Delgado Fernandez and James M. Koukios, Assistant U.S. Attorneys, U.S. Attorney's

Office, 99 N.E. 4th Street, Miami, FL 33132, on this 22nd day of September, 2008.

         /s/ *Hy Shapiro*
         HY SHAPIRO